CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 2 4 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ELLEN DOTSON,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:05cv00039 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Ellen Dotson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq*. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Dotson first filed for DIB on February 24, 1993, but after an initial denial in May of 1993, she took no further action. (Record, ("R"), at 37.) Dotson filed for DIB a second time on February 10, 1994. (R. at 37.) A hearing on this claim was held before an administrative law judge, ("ALJ"), and this claim was denied by opinion dated May 18, 1996. (R. at 35–64.) In denying this claim, the ALJ found that Dotson was not disabled, and the ALJ documented a "discernable pattern of dishonesty" in Dotson's allegations. (R. at 37, 42–43, 60.) Upon denial by the ALJ, Dotson requested review of the ALJ's decision. (R. at 65–67.) On August 14, 1997, the Appeals Council denied this request, and no further action was taken. (R. at 68–70.)

Dotson protectively filed her current applications for DIB and SSI on or about October 9, 2002, alleging disability as of January 1, 1999,[1] based on back pain, leg numbness, swelling of the feet and nerves. (R. at 86–91, 101, 110, 272–75.) The claims were denied initially and upon reconsideration. (R. at 71–73, 76, 77–79, 278–80, 284–86.) Dotson then requested a hearing before an ALJ. (R. at 80.) The ALJ held a hearing on July 8, 2004, at which Dotson was represented by counsel. (R.

---

[1] Dotson's alleged onset date for disability was amended from July 3, 2002, to January 1, 1999. (R. at 88, 94.)

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 2 of 33   Pageid#: 68

at 296–325.)

By decision dated October 13, 2004, the ALJ denied Dotson's claims. (R. at 18–23.) The ALJ found that Dotson met the disability insured status requirements of the Act for disability purposes on January 1, 1999, the date the claimant stated she became unable to work, and continued to meet them through September 30, 1999, but not thereafter. (R. at 21.) The ALJ found that Dotson had not engaged in substantial gainful activity since January 1, 1999. (R. at 21.) The ALJ also found that Dotson was a younger individual with a high-school education. (R. at 22.) While the ALJ stated that Dotson did not have a severe mental impairment, (R. at 21), he, nonetheless, limited her to simple unskilled, low-stress jobs. (R. at 20.) The ALJ determined that the medical evidence in the record established that Dotson suffered from a severe physical impairment, namely mechanical low back pain, but he found that Dotson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) Furthermore, the ALJ noted that Dotson's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ concluded that Dotson retained the residual functional capacity to perform simple, unskilled, nonstressful, light[2] work. (R. at 22.) As a result, the ALJ found that Dotson was unable to return to her past relevant work as a certified nursing assistant and that she did not have any transferable skills from her past work. (R. at 22.) Despite this finding, the ALJ concluded that, based on Dotson's age, education, past work experience and the testimony of a vocational expert, Dotson could perform jobs existing in significant

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

Case 2:05-cv-00039-GMW-PMS    Document 21    Filed 01/24/07    Page 3 of 33    Pageid#: 69

numbers in the national economy, including those of a cashier, a sales clerk, an information clerk, an order clerk and a cleaner. (R. at 22.) Therefore, the ALJ found that Dotson was not under a disability as defined by the Act and that she was not eligible for benefits. (R. at 22–23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Dotson pursued her administrative appeals. (R. at 14.) The Appeals Council denied her request for review on July 29, 2005. (R. at 7–11.) Dotson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Dotson's motion for summary judgment filed January 30, 2006, (Docket Item No. 15), and on the Commissioner's motion for summary judgment filed March 30, 2006, (Docket Item No. 19).

## *II. Facts*

Dotson was born in 1972, which classifies her as a "younger individual" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2006). (R. at 22, 88.) She received a high-school education, but she claimed to have been enrolled in special education classes throughout school since she was in the third or fourth grade. (R. at 18, 107, 299–300.) She has past work experience as a cashier, a housekeeper and a certified nursing assistant, ("CNA"). (R. at 18, 102, 127.)

At her hearing on July 8, 2004, Dotson stated that she was not then-currently employed and that she had not worked since July 3, 2002. (R. at 102, 301.) She

reported holding several different jobs for short periods of time, but she stated that she repeatedly lost these jobs due to her inability to complete paperwork correctly and to maintain an appropriate work pace. (R. at 301–03.) She further stated that she had difficulty with reading and spelling. (R. at 300–01.) However, she also testified that she was able to complete a class and pass a certification examination to receive a CNA certificate. (R. at 320.)

Dotson opined that she was disabled because of pain in her back and leg. (R. at 306.) She reported that she injured her back in 1994 while employed by Holiday Inn. (R. at 306–07.) As a result of this injury, Dotson claimed that she received approximately one to two weeks of workers' compensation, but she was released shortly after she returned to work. (R. at 306–07.)

Besides back pain, Dotson cited several other ailments she felt contributed to her alleged disability, such as muscle spasms, pain in her left leg, swelling in her ankles and incontinence.[3] (R. at 308–10.) Dotson testified that she had never had any back surgeries, but that a doctor had recommended two or three different surgical procedures. (R. at 307.) She also reported that she was unable to see specialists for her medical problems due to a lack of insurance. (R. at 309, 312–13.)

_____

[3] Dotson testified at her July 2004 hearing before the ALJ that her bladder and incontinence problems had started about two years prior. (R. at 310.) Furthermore, on September 10, 1999, during a doctor's visit, she denied having any bladder problems. (R. at 191.) Therefore, it is impossible, based on her own statements, for her bladder problems to be a source of or contributing factor to a disability that began on or prior to September 30, 1999. As a result, this court will not consider any of her alleged bladder or incontinence problems with respect to her DIB claim. In addition, Dotson does not contest the ALJ's analysis or finding that she did not have a severe genitourinary impairment; therefore, the court also will not discuss this alleged impairment with respect to her SSI benefit claims.

Dotson stated that, depending on what she was doing, she could stand for about an hour. (R. at 310.) She also claimed to be unable to sit for extended periods of time. (R. at 311.) Based on her testimony, Dotson could not sit for two hours continually without moving every 35 to 40 minutes. (R. at 311.) In terms of her ability to lift objects, Dotson stated that she was unable to lift her youngest daughter who weighed 32 pounds at the time of the hearing. (R. at 311.) However, she stated that she could carry her grocery bags into her house, but that she received help with heavy items. (R. at 311.)

Dotson also claimed to be receiving treatment for depression and anxiety. (R. at 311–12.) She stated that she received treatment from her general practitioner, Dr. Michael Wheatley, M.D., but despite several referrals, she had not seen a psychiatrist or psychologist. (R. at 312.) Dotson testified that one of her children received special education classes for speech problems, and the other child was bipolar and schizophrenic. (R. at 315.) She also testified that her husband did not help her with her children, and that she often received help from her mother. (R. at 314–15.)

Dotson also stated that, in addition to taking care of her children, cleaning up their rooms and cleaning her house, she drove a car and went to the grocery store alone. (R. at 315–17.) Furthermore, Dotson stated that she socialized with a friend and occasionally attended church. (R. at 318.)

Dotson reported that she had taken medication for her nerves since 1994. (R. at 319.) She also testified that she smoked four packs of cigarettes a day. (R. at 320.) In addition, she noted that occasionally, when she had "a real bad day," she smoked more and experienced breathing troubles. (R. at 319.)

-6-

Donna J. Bardsley, a vocational expert, also was present and testified at Dotson's hearing. (R. at 321–23.) Bardsley testified that Dotson's prior relevant work experience as a CNA was medium[4] and semiskilled. (R. at 321–22.) The ALJ asked Bardsley a number of hypothetical questions about a person's work prospects based on the assumption that the hypothetical individual was of Dotson's age, education and work background. (R. at 322.) The ALJ further stipulated that the hypothetical individual was restricted to light work and could perform only simple, low-stress unskilled jobs. (R. at 322.) In response to this query, Bardsley stated that a significant number of these jobs existed in the regional and national economies that such a hypothetical person could perform. (R. at 322.) Examples of these jobs included a sales clerk, an information clerk, an order clerk and a cleaner. (R. at 322.) Bardsley also was questioned about the employment prospects of a hypothetical individual based on the findings contained in Dr. Wheatley's mental assessment. (R. at 322.) Bardsley testified that such and individual would not be able to perform any jobs. (R. at 322–23.)

In rendering his decision, the ALJ reviewed records from Dr. G. S. Kanwal, M.D.; Dr. Michael W. Wheatley, M.D.; Julie Jennings, Ph.D., a state agency psychologist; R. J. Milan Jr., Ph.D. a state agency psychologist; Dr. F. Joseph Duckwall, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; James Kegley, M.S.; B. Wayne Lanthorn, Ph.D., a licensed psychologist; and Donna J. Abbott, M.A., a licensed psychological examiner. Dotson also submitted additional medical records from Medical Associates of Southwest Virginia,

---

[4] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light work or sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

("Medical Associates"), to the Appeals Council.[5]

Dotson saw Dr. G. S. Kanwal, M.D., on five occasions from September 5, 1997, to December 19, 2002. (R. at 153–59.) Dr. Kanwal's records were largely illegible; however, it was clear that he treated Dotson for complaints of back pain and obesity. (R. at 153–159.) Dr. Kanwal prescribed Elavil to Dotson on December 19, 2002. (R. at 153.) Also, it was evident that on November 5, 2002, x-rays were taken of Dotson's lumbar spine and left hip. (R. at 159.) Dr. Kanwal reported that, based on the x-rays taken, Dotson's left hip was normal and her lumbar spine showed small osteophyte formations at the L2-L3 and L3-L4 levels, but no other significant abnormalities. (R. at 159.)

Dotson saw Dr. Michael W. Wheatley, M.D.,[6] at Medical Associates on September 10, 1999, for complaints of lower back pain. (R. at 191–93.) Dr. Wheatley documented that Dotson's straight leg raise, ("SLR"), tests were negative bilaterally, her deep tendon reflexes, ("DTR"), were normal bilaterally and she had no weakness in her lower extremities. (R. at 193.) However, due to a mild fascia trigger point, Dotson was given an injection on the right side of her back and was given pain medication. (R. at 193.)

Dotson telephoned Dr. Wheatley on September 21, 1999, August 25, 2000, and

---

[5] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 7–11), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir. 1991).

[6] It should be noted at the outset that Dr. Wheatley is a relative of Dotson. (R. at 237.)

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 8 of 33   Pageid#: 74

November 13, 2000, complaining of low back pain. (R. at 185–86, 190.) Following Dotson's September 21, 1999, phone call, Dr. Wheatley noted that her pain medication had likely become less effective because she was taking it entirely too frequently. (R. at 190.) Upon examination for respiratory problems on May 30, 2000, Dr. Wheatley noted that Dotson's heel and toe walk was normal and that she had good flexion and extension. (R. at 188.) At this time, she was given Vioxx and Lortab for back pain. (R. at 188.) On August 25, 2000, Dotson called and received additional Lortab and Vioxx samples, and stated that she had made no effort to lose weight. (R. at 186.) On November 13, 2000, Dotson called again, and Dr. Wheatley refused to provide Dotson with any additional Lortab, or any other prescription pain medication without seeing her again. (R. at 185.)

Dotson presented to Dr. Wheatley on March 29, 2001, complaining of back pain after exercising at the gym. (R. at 184.) A physical examination revealed some paraspinous muscle spasm and some spinous point tenderness. (R. at 184.) However, she refused an x-ray. (R. at 184.) Dr. Wheatley also noted that, despite Dotson's complaints of knee pain, she had no significant knee pathology. (R. at 184.) Additionally, her strength was normal and she had good DTRs. (R. at 184.) Dr. Wheatley diagnosed her with chronic back pain, lumbosacral strain, obesity and a generalized anxiety disorder with major depression. (R. at 184.) She was given samples of Prozac, Lortab, Anabar and Voltaren. (R. at 184.) Dotson was encouraged to continue exercising as long as she was not hurting herself, and she was given some exercises to undertake. (R. at 184.) Dr. Wheatley also noted that Dotson informed him that her family did not want her to have to pay a babysitter while she was out working. (R. at 184.)

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 9 of 33   Pageid#: 75

Dotson returned to Dr. Wheatley on July 18, 2001, and again her SLRs and DTRs were normal bilaterally. (R. at 183.) Dr. Wheatley was unable to determine whether Prozac was helping her depression because she had taken it inconsistently. (R. at 183.) She was given Wellbutrin and was told to quit smoking. (R. at 183.)

On October 18, 2001, Dotson presented to Dr. Wheatley complaining of difficulty sleeping and nervousness. (R. at 181.) She also complained that her back ached "from time to time." (R. at 181.) Dr. Wheatley noted that she experienced no leg pain. (R. at 181.) Dotson was given Lortab, Soma and Ultracet for pain. (R. at 181.) She also was given Klonopin and Effexor for her depression and anxiety. (R. at 181.)

Dotson returned on November 9, 2001, and Dr. Wheatley noted that the Effexor had helped her depression and the Klonopin had helped her anxiety. (R. at 180.) Dr. Wheatley documented Dotson's emotional state as being "a little bit better." (R. at 180.) As a result, her depression and anxiety medications were continued, and she was given more Lortab and Ultram for pain. (R. at 180.) She was instructed to quit smoking and lose weight. (R. at 180.) Dr. Wheatley also instructed Dotson not to lift more than 35 to 40 pounds and not to sit for more than two hours at a time. (R. at 180.)

On December 11, 2001, Dotson visited Dr. Wheatley and was very upset that her uncle had committed suicide. (R. at 179.) However, she stated that her depression had been doing "very well" until this incident. (R. at 179.) He noted that her back pain was unchanged, and that she took approximately 30 Lortabs a month along with Ultram. (R. at 179.)

Dotson presented to Dr. Wheatley on January 11, 2002, July 16, 2002, September 19, 2002, January 7, 2003, February 6, 2003, May 9, 2003, July 29, 2003, August 7, 2003, August 28, 2003, September 29, 2003, and October 24, 2003, complaining of back pain, depression and anxiety. (R. at 164, 166–69, 170–73, 174–75, 178.) She received pain medication at each appointment. (R. at 164, 166–69, 170–73, 174–75, 178.)

On July 16, 2002, Dotson informed Dr. Wheatley that she had been working 16-hour shifts. (R. at 175.) Dr. Wheatley noted that Dotson's mental state improved when she was working and that, with a slight increase in her pain medication, she should be able to work eight-hour days. (R. at 175.) On September 19, 2002, Dotson complained of headaches, anxiety and depression. (R. at 174.) Dr. Wheatley noted that Dotson was "fairly uncompliant with therapy." (R. at 174.) On January 7, 2003, Dr. Wheatley noted that Dotson was not watching what she ate, she was drinking four to six sodas a day, she was continuing to smoke and she was gaining weight. (R. at 173.)

On August 7, 2003, Dr. Wheatley noted that while Dotson continued to complain of back pain, she did not have any radicular signs. (R. at 168.) She had no weakness, no areas of significant numbness, and her DTRs remained normal. (R. at 168.) Dr. Wheatley also noted that Dr. Brasfield and Dr. Platt did not feel any benzodiazepine or opiate management was necessary for Dotson, and based on their examination, they would release her to return to work. (R. at 168.) Dr. Wheatley also noted that he did not have any documentary evidence such as x-rays to confirm his hunch that Dotson had mechanical lower back pain that was exacerbated by her weight and smoking. (R. at 168.) He also stated that she did not need long-term

-11-

narcotics, and that the best things for her would be career retraining along with strength and conditioning programs for her back, which could facilitate weight loss. (R. at 168.) He also noted that Dotson suffered from tobacco dependence. (R. at 168.)

On August 28, 2003, Dr. Wheatley noted that Dotson remained nervous and anxious, but that she was not taking the Lexapro he prescribed to her for this problem. (R. at 167.) Dotson returned to Dr. Wheatley on September 29, 2003, seeking drugs and was denied. (R. at 166.) Dr. Wheatley noted that he believed that Dotson had a substance abuse problem. (R. at 166.) He also noted that she continued to complain of back pain, but he could find nothing wrong with her back that could produce back pain except her obesity. (R. at 166.)

On January 12, 2004, Dotson complained of pain in the left knee; however, only minimal crepitus was noted, and she had full range of motion in both of her knees and ankles. (R. at 163.) She returned on February 17, 2004, again complaining of left knee pain, but once again there was no weakness, no leg numbness and there was no effusion. (R. at 162.) At this time, Dotson stated that she was trying to obtain disability, but Dr. Wheatley stated that he did not have any justification for why she could not work. (R. at 162.) He also stated that she was not currently a candidate for orthopaedic evaluation or an MRI. (R. at 162.) Again on March 18, 2004, Dr. Wheatley noted, that despite complains of severe back pain, Dotson had no leg weakness, numbness or pain. (R. at 255.) An x-ray was taken that showed no problems with Dotson's back, except possibly a small amount of arthritis. (R. at 255.)

-12-

On May 11, 2004, Dotson presented to Dr. Wheatley with complaints of tiredness, difficulty sleeping, left lower quadrant pain, back pain and anxiety related to problems with her mother-in-law. (R. at 288.) At this point, Dr. Wheatley decided to refer Dotson to Dr. Pitone for her mental problems. (R. at 288.) On June 22, 2004, Dotson reported increased stress, nerves and back pain after a suicide in her family[7] and a suicide attempt by her brother. (R. at 289.) Dr. Wheatley noted that Dotson had not been caring for herself, and that she never attended appointments with Dr. Pitone. (R. at 289.) Dr. Wheatley stated that Dotson's physical complaints, including her back pain, were the result of stress, and that her stress needed to be dealt with before giving her more pain medication. (R. at 289.)

On June 21, 2004, July 22, 2004, and September 8, 2004, Dotson continued to complain of back pain, hair loss and stress. (R. at 289–92.) On July 21, 2004, Dr. Souhail Shamiyeh, M.D., at Medical Associates, treated her, noting that he did not have an x-ray of her back to examine and that Dotson refused to have one taken. (R. at 291.) Dr. Shamiyeh noted that once Dotson's stress and depression were dealt with, her pain and hair loss would subside as well. (R. at 291.) On September 8, 2004, while hair loss was listed in her records, Dotson did not mention her hair loss as a continuing problem, and she stated that her back pain was worse due to a higher stress level stemming from her relationship with her mother-in-law. (R. at 292.) Dotson returned on September 21, 2004, complaining of back pain after she exercised

---

[7] Dr. Wheatley's notes indicate that Dotson told him that her husband had hung himself and she had just attended the funeral the prior weekend. (R. at 289.) However, Dotson clearly stated in her testimony to the ALJ on July 8, 2004, that she was married and indicated that her husband was alive. (R. at 316.) Therefore, either Dotson lied to Dr. Wheatley or to the ALJ, or Dr. Wheatley's notes were transcribed incorrectly. Dr. Wheatley's notes for the June 22, 2004, appointment appear to have been taken by April Stidham, F.N.P. (R. at 290.)

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 13 of 33   Pageid#: 79

and went walking. (R. at 294.) Dr. Wheatley continued to document no numbness and no weakness, just subjective reports of pain. (R. at 294.)

On October 12, 2004, Dotson complained of increased back pain, radiating right leg pain and muscle spasm on the right side of her back. (R. at 295.) Dotson reported that she was helping care for her invalid grandmother-in-law, which included lifting her up to a standing position. (R. at 295.) Dr. Wheatley instructed her not to lift items weighing more than 10 pounds and to do exercises daily. (R. at 295.)

Despite all of these findings, a physical assessment completed by Dr. Wheatley on June 22, 2004, indicated that Dotson could lift items weighing less than five pounds, that she could stand/walk no more than 30 minutes in an eight-hour workday, that she could sit no more than 30 minutes in an eight-hour workday, that she should never climb or crawl, but could occasionally stoop, kneel, balance and crouch. (R. at 256–57.) He also noted that she had limited ability to reach, to handle, to feel, to push/pull, to see and to speak, and that she was restricted from working around heights, moving machinery, temperature extremes, noise, fumes, humidity and vibration. (R. at 256–57.) The only support Dr. Wheatley offered for these restrictions was a statement that Dotson suffered from lower back pain, anxiety and depression. (R. at 256–57.)

At the same time, Dr. Wheatley also completed a mental assessment of Dotson's ability to do work-related activities. (R. at 258–59.) He indicated that Dotson had "poor or no" ability to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out complex or detailed

-14-

job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 258–59.) He found that Dotson had a good ability to maintain her personal appearance, but only a fair ability to follow work rules, to interact with supervisors, to understand, remember and carry out simple job instructions and to demonstrate reliability. (R. at 259.) In all other areas of adjustment, Dotson was deemed to have fair abilities. (R. at 258–59.) Dr. Wheatley opined that Dotson was unable to manage benefits in her own best interest and that she could not concentrate or sit for long periods. (R. at 259.)

On October 17, 2002, Dotson first presented to James Kegley, M.S., at Frontier Health, Inc. (R. at 237–38.) She relayed difficulties with her mother-in-law, which Dotson felt was the cause of her extreme depression and agitation. (R. at 237.) Dotson denied any then-current suicidal or homicidal ideation, but admitted to having such thoughts in the past. (R. at 238.) Kegley diagnosed her with an adjustment disorder with mixed anxiety and depression and a then-current Global Assessment of Functioning, ("GAF"), score of 50.[8] (R. at 238.)

Dotson again saw Kegley on October 29, 2002, for complaints of depression or mood disorder. (R. at 253–54.) Dotson reported the same difficulties with her mother-in-law and a lack of support from her husband. (R. at 246–47, 253.) Dotson reported mild difficulties in maintaining attention and concentration, as well as

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

moderate aggression or rage, jitteriness, worrying, insomnia and abuse or neglect. (R. at 250–51.) She reported severe anxiety, anger, depressed mood, feelings of worthlessness, helplessness and hopelessness, hostility and low self-esteem. (R. at 250–51.) However, Kegley noted that Dotson was of average intelligence or above and that she had insight into the problem, effective behavioral controls, independent behaviors, open disclosure and flexible thinking. (R. at 247.) Kegley also found Dotson to be sociable, optimistic about the treatment and able to engage in problem-solving. (R. at 247.) Finally, Kegley noted that she had a dysfunctional family of origin, limited financial resources and inadequate leisure or recreation. (R. at 247.) Dotson's diagnoses remained unchanged. (R. at 242, 245, 247.)

On November 13, 2002, Dotson reported continued difficulties with her mother-in-law. (R. at 233.) Kegley noted that Dotson was mildly to moderately depressed with a congruent affect. (R. at 233.) Dotson also stated that if the problem with her mother-in-law could be solved, she would be fine. (R. at 233.) On December 2, 2002, Dotson again reported difficulties with her mother-in-law. (R. at 229.) However, Kegley noted that Dotson's mood ranged from mildly depressed to mildly elated and her affect was congruent to her moods. (R. at 229.) Despite this finding, her diagnoses remained unchanged. (R. at 229.)

Dotson missed several appointments during her treatment period with Kegley. (R. at 217, 220, 225, 228, 231–32, 235–36.) Several telephone calls and letters were sent to determine whether Dotson wished to reschedule appointments and to continue to receive therapy. (R. at 216–20, 223–25, 227–28, 232, 235–36.) On March 5, 2003, Dotson was contacted by telephone and she indicated that she intended to continue with therapy and scheduled an appointment for March 14, 2003. (R. at 218.)

-16-

However, Dotson missed that appointment as well. (R. at 217.) Additional attempts to contact Dotson about scheduling another appointment were made on March 14, 2003, and March 26, 2003, but there are no further records of any contact with Kegley or Frontier Health after these dates. (R. at 216–17.)

Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on July 17, 2003, indicating that Dotson suffered from a nonsevere affective disorder. (R. at 194–207.) More specifically, Jennings determined that Dotson suffered from depression. (R. at 197.) Jennings indicated that Dotson had mild limitations in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 204.) She found that Dotson had no episodes of decompensation. (R. at 204.) Jennings noted numerous activities of daily living that Dotson was able to undertake such as taking care of her children, household chores, grocery shopping, television watching and taking medication without assistance. (R. at 206.) She further noted that Dotson's symptoms were partially credible. (R. at 206.) This assessment was affirmed by R. J. Milan Jr., Ph.D., another state agency psychologist, on November 20, 2003. (R. at 194.)

On July 18, 2003, Dr. F. Joseph Duckwall, M.D., a state agency physician, completed a residual functional capacity assessment. (R. at 208–15.) Dr. Duckwall found that Dotson had the physical residual functional capacity to perform medium work. (R. at 208–15.) Dr. Duckwall also found that Dotson was able to frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl, occasionally climb ladders, but never climb ropes or scaffolds. (R. at 210.) Dr. Duckwall further found that Dotson had no manipulative, visual, communicative or environmental limitations,

-17-

except that she should avoid concentrated exposure to hazards. (R. at 211–12.) He found that Dotson's allegations were partially credible. (R. at 213.) Dr. Duckwall also noted that despite back pain complaints, x-rays from November 2002 demonstrated Dotson's left hip was normal, and her lumbar spine showed small osteophyte formations at the L2-L3 and L3-L4 levels, but no other significant abnormalities. (R. at 209.) Additionally, Dr. Duckwall noted that her SLR tests were consistently negative, her DTRs were normal and her strength was normal. (R. at 210.) Furthermore, despite knee pain complaints, there was never any documented knee pathology. (R. at 210.) Dr. Duckwall's findings were affirmed by Dr. Randall Hays, M.D., another state agency physician, on July 18, 2003. (R. at 215.)

On August 14, 2004, Donna Abbott, M.A., a licensed psychological examiner, and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Dotson at the request of Disability Determination Services. (R. at 261–67.) Dotson reported that she had received no mental health treatment. (R. at 262.) She stated that she smoked four packs of cigarettes a day. (R. at 262.) Lanthorn and Abbott noted that Dotson was fully oriented. (R. at 263.) Dotson was cooperative and conversational. (R. at 263.) Lanthorn and Abbott stated that, at times, Dotson's effort appeared marginal. (R. at 263.) Her memory processes appeared intact, and she was found to have a fair abstract ability, but her usage of common sense appeared marginal. (R. at 263.) Dotson was able to attend, concentrate and follow directions. (R. at 263.) Her affect was fairly appropriate, she denied hallucinations and no overt signs of disordered thought processes or delusional thinking were documented. (R. at 263.) Lanthorn and Abbott noted that Dotson was rational and alert. (R. at 263.) Dotson's difficulties with her mother-in-law were noted, and Dotson indicated that whether she had a good day or not depended on her seven-year-old daughter. (R. at 263.)

-18-

Lanthorn and Abbott noted that an adjustment disorder with anxiety was suggested. (R. at 263.)

Lanthorn and Abbott also noted that Dotson took care of her two children, one of which had emotional and behavioral problems. (R. at 264, 266.) Additionally, Dotson was able to cook, perform housework, drive and perform self-help skills. (R. at 264, 266.) They stated that Dotson related appropriately to them, and they opined that she would be able to relate appropriately to others. (R. at 264.) They further opined that Dotson could manage her own resources. (R. at 264.)

Lanthorn and Abbott administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Dotson achieved a verbal IQ score of 76, a performance IQ score of 73 and a full-scale IQ score of 72, placing her in the borderline range of intellectual functioning. (R. at 264.) However, Lanthorn and Abbott noted that Dotson's effort was marginal and suspected that Dotson's potential was higher. (R. at 265.) Dotson was diagnosed with an adjustment disorder with anxiety, relational problems, not otherwise specified, borderline intellectual functioning and a then-current GAF score of 65.[9] (R. at 265–66.) However, they noted that they ruled out intellectual functioning in the low average range due to Dotson's marginal effort. (R. at 265.)

Lanthorn and Abbott noted that Dotson appeared able to understand and remember, as well as to attend and concentrate to complete tasks. (R. at 266.) They

---

[9]A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

noted that she might have some difficulty sustaining a routine due to her health problems, but that her social interaction did not appear significantly limited. (R. at 266.) They noted that her general adaptation skills appeared to be fair, but that she might have some difficulty handling any additional stress. (R. at 266.) Lanthorn and Abbott recommended that Dotson attend mental health and family counseling on a regular basis and that she might benefit from stress reduction therapy. (R. at 266.) They further noted that she might find an anti-anxiety medication helpful. (R. at 266.)

On September 1, 2004, Abbott completed a work-related mental assessment, indicating that Dotson had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 268–70.) She further found that Dotson had a seriously limited, but not precluded, ability to deal with work stresses, to understand, remember and carry out complex job instructions and to demonstrate reliability. (R. at 268–69.) In all other areas of adjustment, Dotson was deemed to have satisfactory abilities. (R. at 268–69.) Abbott also indicated that while Dotson had a borderline IQ and below average intellectual abilities, her potential was possibly higher. (R. at 269.) Abbott concluded that Dotson could manage benefits in her own best interest. (R. at 270.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006), *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is

-20-

working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)–(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 13, 2004, the ALJ denied Dotson's claims. (R. at 18–23.) The ALJ found that Dotson met the disability insured status requirements of the Act for disability purposes on January 1, 1999, the date the claimant stated she became unable to work, and continued to meet them through September 30, 1999, but not thereafter. (R. at 21.) The ALJ found that Dotson had not engaged in substantial gainful activity since January 1, 1999. (R. at 21.) The ALJ also found that Dotson was a younger individual with a high-school education. (R. at 22.) While the ALJ stated that Dotson did not have a severe mental impairment, (R. at 21), he, nonetheless, limited her to simple unskilled, low-stress jobs. (R. at 20.) The ALJ

determined that the medical evidence in the record established that Dotson suffered from a severe physical impairment, namely mechanical low back pain, but he found that Dotson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) Furthermore, the ALJ noted that Dotson's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ concluded that Dotson retained the residual functional capacity to perform simple, unskilled, nonstressful, light work. (R. at 22.) As a result, the ALJ found that Dotson was unable to return to her past relevant work as a certified nursing assistant and that she did not have any transferable skills from her past work. (R. at 22.) Despite this finding, the ALJ concluded that, based on Dotson's age, education, past work experience and the testimony of a vocational expert, Dotson could perform jobs existing in significant numbers in the national economy. (R. at 22.) Therefore, the ALJ found that Dotson was not under a disability as defined by the Act and that she was not eligible for benefits. (R. at 22–23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Dotson first argues that the ALJ erred in his evaluation of Dotson's mental impairment. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7–12.) Second, Dotson argues that the ALJ erred in determining her residual functional capacity by finding her able to do light work and by rejecting the physical assessment of Dr. Wheatley, her treating physician. (Plaintiff's Brief at 12–14.) Finally, Dotson argues that the ALJ's hypothetical to the vocational expert did not reflect Dotson's mental impairments. (Plaintiff's Brief at 14.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).

While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record support his findings.

Dotson's first argument is that the ALJ's evaluation of her mental impairment is not supported by substantial evidence. (Plaintiff's Brief at 7–12.) This claim is

without merit with respect to both Dotson's DIB claim and SSI claim. With respect to Dotson's DIB claim, the ALJ found that Dotson met the disability insured status requirements of the Act for disability purposes on January 1, 1999, the date the claimant stated she became unable to work, and continued to meet them through September 30, 1999, but not thereafter. (R. at 21.) As a result, for Dotson to have a severe mental impairment that could qualify her for DIB benefits the impairment would need to have materialized and been documented prior to September 30, 1999.

The record contains no such documentation of a mental impairment. Dotson claimed at her hearing that she had been taking medication for her "nerves" since 1994. (R. at 319.) She also claimed that she had difficulty reading and spelling, and she testified that she was enrolled in special education classes since she was in third or fourth grade. (R. at 299–300.) However, there is no documentation in the record for any of these subjective assertions. In fact, the first documentation in the record of a diagnosed mental health problem was in Dr. Wheatley's March 29, 2001, examination notes. (R. at 184.) This occurred approximately a year and a half after her disability insured status had lapsed and more than two years after her alleged onset date. Therefore, Dotson is not eligible for DIB benefits based on any alleged mental impairments.

Dotson also has made a claim for SSI benefits. An SSI claim does not have the same disability insured status requirements as a DIB claim; therefore, the record must be examined for dates after September 30, 1999, for documentation of a mental impairment. However, even after such an examination, Dotson's SSI claim is without merit. The ALJ analyzed all of Dotson's records of mental health treatment including those of Kegley, Dotson's treating psychologist, Lanthorn, Abbott and Dr. Wheatley,

Dotson's treating physician. (R. at 19–21.) Based on this analysis of Dotson's mental health and educational background, the ALJ placed restrictions on Dotson's residual functional capacity and made a finding that she was limited to simple, unskilled, low-stress employment. (R. at 20.) Thus, although the ALJ made an isolated statement in the text of his opinion finding that Dotson had no severe mental impairment that had lasted, or was expected to last, for a period of 12 continuous months, this statement was in error because the ALJ necessarily found a severe impairment by finding restrictions on Dotson's mental work-related abilities. Nevertheless, the overwhelming evidence in the record supports the ALJ's residual functional capacity finding.

Pursuant to 20 C.F.R. §§ 404.1523, 404.1545(a), 416.923, 416.945(a) (2006), the key determination the ALJ must make when an applicant complains of multiple impairments is whether the applicant has any functional limitations on her ability to work based on all of her impairments, whether or not the impairments are severe. This determination is the applicant's residual functional capacity. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). Furthermore, 20 C.F.R. §§ 404.1523, 416.923 specifically state that the ALJ should consider the "combined effect of all of [an applicant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity" to render the applicant disabled.

The ALJ conducted an analysis of all of Dotson's mental and physical limitations, and after examining all of the combined effects of these alleged impairments, the ALJ made a determination that Dotson had a residual functional capacity to perform simple, low-stress, unskilled light work. (R. at 20, 22.) Despite

-25-

the ALJ's harmless misstatement that Dotson's mental impairment was not severe, the ALJ necessarily found that Dotson experienced a severe mental impairment and took that impairment into consideration in his assessment of Dotson's residual functional capacity.[10] Thus, the ALJ's decision, and his findings as a whole, made it clear Dotson's ability to work was limited due to her mental impairments.

To be valid, this determination of Dotson's residual functional capacity must be supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In this case, the ALJ adjusted Dotson's residual functional capacity to accommodate her documented mental impairments by limiting her to simple, low-stress light work. (R. at 20–22.) In the process, the ALJ found her mental complaints, her physical complaints or the combination of the two did not constitute a disabling condition. These determinations by the ALJ are supported by substantial evidence and, thus, will be upheld by this court. *See Akers*, 131 F.3d at 439–40; *Hays*, 907 F.2d at 1456.

In this case, neither Kegley nor Abbott and Lanthorn ever made a finding that Dotson's stress, depression and anxiety would limit her ability to perform simple, low-stress light work, as the ALJ recommended. Even Dr. Wheatley, Dotson's treating physician, whom Dotson relies upon to support her contention that the ALJ erred in his determination of her mental impairment, stated that Dotson's mental state improved when she was working, and that with a slight increase in her pain medication for her back she should be able to work eight-hour days. (R. at 175.) Dr. Wheatley also stated that working eight-hour days should lower Dotson's stress and

---

[10] While the ALJ made the statement that Dotson had no severe mental impairment in the body of his opinion, he did not include this statement in his findings section of the opinion. Instead, the ALJ only included Dotson's residual functional capacity, which is supported by substantial evidence. (R. at 21–22.)

-26-

anxiety level. (R. at 175.) Finally, Dr. Wheatley stated that he did not have any justification for why Dotson could not work. (R. at 162.)

In addition, Kegley found that Dotson was of average intelligence or better, that she was sociable and that she engaged in effective problem-solving. (R. at 247.) After her first two appointments, when Dotson was documented by Kegley as being extremely depressed and agitated because of the actions of her mother-in-law, (R. at 237, 253), Kegley began to note improvements in Dotson's mood. (R. at 233, 229.) By Dotson's fourth and final appointment, Kegley noted that her mood was mildly depressed to mildly elated, a dramatic improvement. (R. at 229.) Furthermore, Abbott and Lanthorn concluded that Dotson suffered from an adjustment disorder with anxiety, but that Dotson was still able to take care of two children, one of whom suffered from severe emotional and behavioral problems. (R. at 263–66.) Additionally, Dotson was able to cook, perform housework, drive and perform self-help skills. (R. at 264, 266.) Dotson was found able to relate appropriately and able to manage her own resources. (R. at 264.) Therefore, based on the observations of Kegley, Abbott and Lanthorn, as well as the statements by Dr. Wheatley, there is substantial evidence to support the ALJ's conclusion that Dotson's alleged mental issues did not limit her ability to perform simple, low-stress, unskilled light work.

The ALJ also examined the areas in which Dotson was found by Abbott and Lanthorn to have serious limitations, namely dealing with work stress, demonstrating reliability and understanding, remembering and carrying out complex job instructions. (R. at 19–20.) The ALJ determined that these limitations were all the result of Dotson's stressful situations at home, her potentially limited intellect and her health problems. (R. at 19–20.) As a result, the ALJ limited Dotson to simple, low-stress

work to incorporate the limitations documented by Lanthorn and Abbott and other sources. (R. at 20.) Based on the record of Dotson's mental issues discussed above and Dotson's own activities, the ALJ's determination of her residual functional capacity is supported by substantial evidence. *See Hays*, 907 F.2d at 1456.

Furthermore, substantial evidence exists in the record from treating sources to suggest that if Dotson were to follow through with her treatment and medication, her mental problems could be brought under control. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Purdham v. Celebrezze*, 349 F.2d 828, 830 (4th Cir. 1965)). In particular, Dr. Wheatley noted that Dotson's mental health symptoms responded to medication, (R. at 174, 178, 180), but she frequently did not comply with treatment. (R. at 167, 174, 178, 183, 289.) Dr. Wheatley noted that Dotson's mental state improved when she was working, and he believed that with pain medication, she should be able to work eight-hour days. (R. at 175.) Additionally, as noted above, Kegley documented a vast improvement in Dotson's mood after a few short treatment sessions. (R. at 229.) However, after these few sessions and steady improvement, Dotson again failed to follow through with her treatment. (R. at 216–28.) Thus, in this case, there is substantial evidence in the record indicating that any potential metal impairments Dotson might have experienced could be controlled by medication and treatment. As a result, the ALJ was certainly justified in finding that Dotson was not disabled by her alleged mental impairments. *See Gross*, 785 F.2d at 1166.

Additionally, Abbott and Lanthorn found stress from Dotson's relationship with her mother-in-law to be the root of her mental issues. The sentiment that stress

-28-

was the cause of her problems also was expressed by Dr. Wheatley, (R. at 289), as well as by Dr. Shamiyeh. (R. at 291.) Dotson herself even admitted that stress was the cause of the majority her physical and mental problems. (R. at 233, 237, 292.) Based on the record, it appears that a great deal of Dotson's stress-related mental issues were situational. Her reports of increased stress, anxiety or depression were influenced by outside forces such as deaths in her family, a four-pack-a-day smoking habit, suicide attempts in her family, conflicts with her mother-in-law and caring for her daughter who suffered from emotional problems. (R. at 175, 179, 233, 237, 262–64, 289, 292, 319.) Finally, Dotson herself admitted that if she could resolve her conflicts with her mother-in-law she would be fine. (R. at 233.) As a result, there is substantial evidence in the record for the ALJ to have reasonably concluded that Dotson suffered sporadic bouts with stress-related mental problems, which could be controlled with treatment if Dotson were compliant. The ALJ also could have reasonably concluded that Dotson's problems would disappear altogether if she simply resolved her issues with her mother-in-law, as Dotson, herself, stated.

The second argument made by Dotson is that the ALJ erred by not giving proper weight to Dr. Wheatley's physical assessment of Dotson. (Plaintiff's Brief at 12.) Dotson claims that Dr. Wheatley's evaluation was not contradicted by any other examining record. (Plaintiff's Brief at 12–13.) This argument is baseless. The ALJ did consider all of Dr. Wheatley's records before making the finding that Dotson had a severe impairment of mechanical lower back pain, but that she did not have an impairment or combination of impairments listed at, or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20–22.) The ALJ noted that he gave Dotson every benefit of the doubt in making this determination because the evidence could have supported a finding of no severe musculoskeletal impairment

Case 2:05-cv-00039-GMW-PMS    Document 21    Filed 01/24/07    Page 29 of 33    Pageid#: 95

whatsoever. (R. at 20.) The ALJ's determination is supported by substantial evidence.

While Dotson relies on Dr. Wheatley's physical assessment to claim error, this physical assessment is contradicted by the entirety of Dotson's medical records and is even contradicted by Dr. Wheatley's own statements and observations. First, Dr. Wheatley, himself, stated only a few months prior to his physical assessment that he had no justification for why Dotson could not work. (R. at 162.) In addition, he found that Dotson was not a candidate for orthopaedic evaluation or an MRI. (R. at 162.) In fact, on the same day that Dr. Wheatley completed the physical assessment of Dotson, June 22, 2004, he stated that he believed her physical complaints, including her back pain, were being caused by stress, not by an underlying physical problem. (R. at 289.) One month later, Dr. Shamiyeh came to the same conclusion that stress was causing her pain. (R. at 291.) Dotson even concurred that her back pain was a result of stress. (R. at 292.)

On other occasions Dr. Wheatley noted that he "[could not] find any significant pathology in her back other than the fact that she is obese." (R. at 166.) He indicated that despite complaints of knee pain, he found no significant knee pathology. (R. at 184.) In July 2002, during Dotson's alleged period of disability, Dr. Wheatley documented that Dotson was working 16-hour shifts. (R. at 175.) He noted that with a slight increase in her pain medication, Dotson should be able to work eight-hour days. (R. at 175.) In August 2003, he stated that he did not have any documentary evidence, such as x-rays, to confirm that Dotson had mechanical lower back pain. (R. at 168.) He believed that Dotson did not need long-term narcotics and that the best thing for her would be to find a career and to work on strengthening, conditioning and

-30-

weight loss. (R. at 168.) Additionally, Dr. Wheatley noted that both Dr. Brasfield and Dr. Platt did not think that benzodiazepine or opiate management was necessary for Dotson and that she could return to work. (R. at 168.) Finally, Dr. Wheatley noted that Dotson informed him that her family, of which Dr. Wheatley was a part, did not want to have to pay a babysitter while she was out working. (R. at 184, 237.)

Furthermore, the physical evidence does not support a finding of any sort of physical ailment that could cause back pain or limit Dotson in the manner described in Dr. Wheatley's physical assessment. Dr. Kanwal, who examined Dotson for complaints of back and hip pain, ordered x-rays of Dotson's left hip and lumbar spine, which revealed small osteophyte formations at the L2-L3 and L3-L4 levels, but no other significant abnormalities. (R. at 159.) In addition, he found that the left hip was entirely normal. (R. at 159.) Tests performed on Dotson have repeatedly found no signs of a physical problem; for example, her SLR tests have repeatedly been negative, her DTR tests have been normal and she has never reported any weakness or loss of strength. (R. at 162, 168, 183–84, 188, 193, 255.) When Dr. Wheatley did take an x-ray of Dotson after complaints of back pain, he indicated that the x-ray did not show any problems except possibly a small amount of arthritis. (R. at 255.) This x-ray was taken just three months prior to his physical assessment. (R. at 255.) In addition, Dr. Wheatley had documented drug-seeking behavior from Dotson and on several occasions declined to provide her additional pain medication. (R. at 166, 185, 289.)

Therefore, substantial evidence exists to support the weight given by the ALJ to Dr. Wheatley's physical assessment, substantial evidence exists to support the ALJ's determination of Dotson's residual functional capacity and substantial

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 31 of 33   Pageid#: 97

evidence exists to support the ALJs evaluation of Dotson's alleged impairment.

Dotson's final argument is that the ALJ's hypothetical to the vocational expert did not accurately reflect Dotson's mental impairments and associated limitations. (Plaintiff's Brief at 14.) This argument also is without merit.

Testimony of a vocational expert constitutes substantial evidence for the purposes of judicial review where his or her opinion is based upon consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). A hypothetical question is valid if it "adequately reflect[s]" a residual functional capacity for which the ALJ had sufficient evidence. *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). A determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) does the hypothetical adequately set forth the residual functional capacity as found by the ALJ?

As discussed above, there is substantial evidence to support the ALJ's finding of Dotson's residual functional capacity. Therefore, all that remains to be considered is whether the hypothetical question adequately sets forth this residual functional capacity. In this case, the ALJ's hypothetical took into account and recited the precise limitations that the ALJ placed on Dotson. The hypothetical question took into account Dotson's mental state, because her mental state was clearly a factor the ALJ evaluated in determining that Dotson could perform simple, low-stress work. The hypothetical posed to the vocational expert specifically restricted the

hypothetical person to simple, low-stress light work, the exact limitations the ALJ placed on Dotson. (R. at 322.) Thus, the impairments documented in the record and evaluated by the ALJ were taken into consideration in this hypothetical question. Therefore, the hypothetical question adequately reflects a residual functional capacity that is supported by substantial evidence and, thus, it will be upheld. *See Johnson*, 434 F.3d at 659.

### IV. Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment is overruled and the Commissioner's motion for summary judgment is sustained.

An appropriate order will be entered.

**DATED**:    This 2ꝯ day of January 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:05-cv-00039-GMW-PMS   Document 21   Filed 01/24/07   Page 33 of 33   Pageid#: 99